**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

DOMINIC S. CAVATAIO

      *Plaintiff*,

*v.*

COMISSIONER OF SOCIAL
SECURITY,

      *Defendant*.

_____/

CASE NO. 20-CV-11754

HON. ARTHUR J. TARNOW
DISTRICT JUDGE

HON. PATRICIA T. MORRIS
MAGISTRATE JUDGE

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS MOTIONS FOR SUMMARY JUDGMENT (ECF Nos. 14, 17)

### I.   RECOMMENDATION

Plaintiff Dominic Cavataio challenges the Commissioner of Social Security regarding a final decision denying his claim for Social Security Income ("SSI"). The case was referred to the undersigned for review. (ECF No. 2); *see* 28 U.S.C. § 636(b)(1)(B); E.D. Mich. LR 72.1(b)(3). For the reasons below, I conclude that substantial evidence supports the Commissioner's decision. Accordingly, I recommend **DENYING** Plaintiff's motion for summary judgment, (ECF No. 14), **GRANTING** the Commissioner's motion, (ECF No. 17), and affirming the decision.

### II.   REPORT

#### A. Introduction and Procedural History

Plaintiff's application for SSI was protectively filed on March 30, 2017. (ECF No. 12-5, PageID.250; *see also* ECF No. 12-2, PageID.68; ECF No. 12-3, PageID.156.) He

alleged he became disabled on May 2, 2016. (*Id.*) The Commissioner denied the claim on September 15, 2017. (ECF No. 12-4, PageID.168.) Plaintiff then requested a hearing before an administrative law judge ("ALJ"), which occurred on January 24, 2019. (*Id.* at PageID.177; ECF No. 12-2, PageID.84.) The ALJ issued a decision on April 24, 2019, finding that Plaintiff was not disabled. (*Id.* at PageID.78.) The Appeals Council denied review on May 7, 2020. (ECF No. 12-2, PageID.51.) Plaintiff sought judicial review on June 30, 2020. (ECF No. 1.) The parties filed cross-motions for summary judgment and briefing is complete. (ECF Nos. 14, 17.)

## B. Standard of Review

The Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The District Court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x. 502, 506 (6th Cir. 2014) (internal quotation marks omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted). "[T]he threshold for such evidentiary sufficiency is not high. . . . It means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). The Court

2

will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions

of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994).

If the Commissioner's decision is supported by substantial evidence, "it must be affirmed

even if the reviewing court would decide the matter differently and even if substantial

evidence also supports the opposite conclusion." *Id*. at 286. (internal citations omitted).

### C. Framework for Disability Determinations

Disability benefits are available only to those with a "disability." *Colvin v. Barnhart*,

475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically
> determinable physical or mental impairment which can be expected to result
> in death or which has lasted or can be expected to last for a continuous period
> of not less than [twelve] months.

42 U.S.C. § 1382c(a)(3)(A). The Commissioner's regulations provide that disability is

determined through the application of a five-step sequential analysis:

> (i) At the first step, we consider your work activity, if any. If you are doing
> substantial gainful activity, we will find that you are not disabled.

> (ii) At the second step, we consider the medical severity of your
> impairment(s). If you do not have a severe medically determinable physical
> or mental impairment that meets the duration requirement . . . or a
> combination of impairments that is severe and meets the duration
> requirement, we will find that you are not disabled.

> (iii) At the third step, we also consider the medical severity of your
> impairment(s). If you have an impairment(s) that meets or equals one of our
> listings in appendix 1 of this subpart and meets the duration requirement, we
> will find that you are disabled.

> (iv) At the fourth step, we consider our assessment of your residual functional
> capacity and your past relevant work. If you can still do your past relevant
> work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that [he or] she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The claimant must provide evidence establishing the residual functional capacity, which "is the most [the claimant] can still do despite [his or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).

The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

### D.  ALJ Findings

Following the five-step sequential analysis, the ALJ determined that Plaintiff was not disabled. (ECF No. 12-2, PageID.78.) At step one, the ALJ found Plaintiff had not engaged in substantial gainful activity since "March 30, 2017, the application date." (*Id*. at PageID.70.) At step two, the ALJ concluded that Plaintiff had the following severe

4

impairments: history of aortic valve replacement due to aortic valve endocarditis with moderate to severe mitral regurgitation; and cervical and lumbar degenerative disc disease with right-sided lumbar radiculopathy, peripheral neuropathy, and chronic pain syndrome. (*Id*.) The ALJ found the following impairments to be non-severe: impairments related to history of bilateral carpal tunnel release; history of open reduction internal fixation (ORIF) of the right hand; history of hernia repair; hepatitis C; hyperlipidemia; asthma; history of chronic obstructive pulmonary disease (COPD); and obesity. (*Id*.) The ALJ also noted the following mental impairments as non-severe: major depressive disorder; generalized anxiety disorder; adjust [sic] disorder with anxiety; and opioid use disorder. (*Id*. at PageID.71.) None of these impairments met or medically equaled a listed impairment at step three. (*Id.* at PageID.72.) Next, the ALJ found that Plaintiff had the residual functional capacity ("RFC"):

> to perform light work as defined in 20 CFR 416.967(b) except that he is limited to occasional climbing of stairs, and occasional crouching, crawling, kneeling, stooping, and bending. In addition, the claimant must avoid workplace hazards such as dangerous moving machinery and unprotected heights. Due to the need to avoid hazards, the claimant can never climb ladders, ropes, or scaffolds.

(*Id*. at PageID.73.) At step four, the ALJ found that Plaintiff could perform his past relevant work as an inspector. (*Id.* at PageID.77.) Finally, at step five, the ALJ determined that Plaintiff could perform a significant number of jobs in the national economy, including, for example, his prior work as an inspector. (*Id.* at PageID.77-78.) Accordingly, the ALJ concluded that Plaintiff was not disabled. (*Id.* at PageID.78.)

### E.  Administrative Record

#### i.      Plaintiff's Testimony at the Administrative Hearing

Plaintiff was first questioned by his attorney. (ECF No. 12-2, PageID.90.) In 2004, Plaintiff worked for a company called Saint-Gobain Secured doing assembly and production for automotive products. (*Id*. at PageID.92.) He was "inspector of automotive parts." (*Id*.) In 2012, he worked for a company called Plast-O-Foam LLC as a compression press operator where he also performed quality control and inspecting. (*Id*.) In 2015 he worked for a company called City Smoke Prep House LLC as a dishwasher / "prep cook" and at a company called Bad Brad's B-B-Q for about one year. (*Id*. at PageID.92-93.)

Plaintiff's attorney then questioned Plaintiff about his health. Plaintiff testified that the maximum amount of time he can stand is two to three hours. (*Id*. at PageID.93.) The maximum amount of time he can walk is about one half hour. (*Id*. at PageID.94.) Plaintiff claimed that he was limited in his ability to stand or walk due to the edema in both of his legs, "the pain and the swelling." (*Id*.) Plaintiff can sit, with his feet on the floor, for about one hour. (*Id*.) He cannot sit for longer due to "circulatory problems. [His] legs get painful and they swell up." (*Id*.) To decrease the swelling in his legs, Plaintiff must elevate both of his legs above his waist. (*Id*.) Plaintiff is on medication but testified that his doctor could not increase his dosage from its current level. (*Id*. at PageID.95.) If Plaintiff were to walk for two and one half to three and one half hours in a day, he testified that he would have to elevate his legs for four hours to reduce the swelling. (*Id*.) If he were to remain seated with his feet on the floor for an hour, he would have to elevate his legs for four hours to reduce the swelling. (*Id*. at PageID.95-96.) A footstool about 12 inches in height does not help

Plaintiff with the swelling and he testified that it would actually make the swelling worse. (*Id*. at PageID.96.) When asked how long, during an eight-hour period, Plaintiff spends lying down with his legs elevated, Plaintiff responded about three to four hours; in addition, he spends one to two hours seated with his legs elevated waist level. (*Id*.) Plaintiff stated that his ability to do chores is "very minimal" and he spends about one hour to one- and one-half doing chores or other household activities per day. (*Id*. at PageID.96-97.)

Then the ALJ questioned Plaintiff. (*Id*. at PageID.97.) At the time of hearing, Plaintiff was 49 years old. (*Id*.) He was living with friends at the time and had been with them for about two years. (*Id*. at PageID.97-98.) Plaintiff graduated from high school but did not have any college or vocational training. (*Id*. at PageID.99.) In 2016 Plaintiff had complications and went to the hospital after a very bad case of pneumonia—he developed sepsis, endocarditis, and a blood infection. (*Id*.) He had a heart valve replaced and eventually recovered, although he had to learn how to walk again and attended physical therapy. (*Id*. at PageID.100.) Plaintiff did not use a cane and did not use any device to help him walk. (*Id*. at PageID.101.) He testified that he did use a walker "at one point," but had recovered past the point of needing to use it. (*Id*.) Plaintiff confirmed that he elevates his legs for about four hours per day and uses the bathroom about every half hour due to water pills that he takes. (*Id*. at PageID.102-103.) Plaintiff testified to being able to take care of his own hygiene including bathing himself and brushing his teeth. (*Id*. at PageID.103.) He takes medications for mental health problems and stated that he has two to three "better" mental health days in a week. (*Id*. at PageID.103-104.) Plaintiff does not drive and did not have a driver's license because he did not renew it after it expired. (*Id*. at PageID.104.)

Plaintiff testified to being able to wash his clothes and cook for himself. (*Id*. at PageID.105.)

The ALJ brought up Plaintiff's history of drug use, and Plaintiff explained that he has been drug free since May of 2016. (*Id*. at PageID.105-106.) He smokes cigarettes and wears a nicotine patch at night. (*Id*. at PageID.106-107.) Plaintiff stated that he does not drink alcohol. (*Id*. at PageID.107.)

The ALJ asked Plaintiff why he feels he is unable to work. (*Id*. at PageID.108.) Plaintiff responded that his need to frequently use the bathroom and to elevate his legs would make working five full days a week too difficult. (*Id*. at PageID.108-109.)

### ii.   The Vocational Expert's ("VE") Testimony at the Administrative Hearing

The ALJ questioned the vocational expert (VE). (*Id*. at PageID.111.) Before testifying, the VE asked Plaintiff to clarify his responsibilities using the compression press and molding machines in his prior jobs. (*Id*.) Plaintiff confirmed that he set up and operated the machines. (*Id*.)

The ALJ then asked the VE to consider a hypothetical individual of Plaintiff's age and education who was limited to a full range of light work with the following additional limitations:

> He could only occasionally climb stairs, crouch or crawl, and kneel, stoop, or bend. He wouldn't be able to work near hazards, and that would include things like dangerous moving machinery or work at unprotected heights. So I wouldn't want him climbing any ladders, ropes, or scaffolding.

(*Id*. at PageID.117.) The ALJ asked whether such an individual could perform Plaintiff's past work, and the VE testified that such an individual could not perform Plaintiff's past work, "with one exception. And that would be the job of inspector is [sic] light and consistent with the parameters of the hypothetical as the job is typically performed." (*Id*.) The VE testified that there would be other jobs available in the national economy for such an individual, as well; for example, assembler, DOT code 706.684-030, 36,000 jobs; inspection work, DOT code 669.687-014, 12,500 jobs; or product processing, which the VE stated included "a whole range of simple, repetitive tasks and process that involve small parts or objects that don't fit into larger categories of assembly and inspection sorting[,]" and include tasks such as "buffing, polishing, trimming, laminating," and more. (*Id*. at PageID.119.) The VE provided the DOT code for this category as 713.684-038, and that there were 30,000 jobs nationally. (*Id*.) The ALJ asked whether the inspector position or any of the listed positions offered flexibility to work from a seated or standing position. (*Id*.) The VE responded that approximately 80% of the jobs would offer that option. (*Id*. at PageID.120.)

> The ALJ then asked about an individual who:
>
> Needed to have opportunities for breaks to elevate his legs like our claimant talked about, and he's elevating them above his waist, so at quite a high elevation, and he said he's doing that for about four hours a day. Let's say he needs these breaks at least 15 minutes an hour to do that while he's at the job site.

(*Id*.) The VE responded that "someone who is off task 15 minutes out of every hour is not going to be able to work competitively." (*Id*.) The ALJ asked whether, "in order to elevate his legs," the individual being absent at least twice a month on a recurring basis would

affect his ability to remain employed. (*Id*.) The VE responded that "someone who is missing work at least twice a month is not going to be able to hold competitive employment in my experience." (*Id*. at PageID.121.) The VE testified that there would not be an opportunity at a worksite to elevate one's legs in competitive employment. (*Id*.)

The VE stated that several factors of his testimony fell outside the scope of the DOT, including leg elevation, time off task, and absenteeism. (*Id*.) He also noted that "the effect on employment in certain types of jobs if a person required the ability to alternate between sitting and standing" is not addressed in the DOT. (*Id*.) He noted that his responses were based on his 39 years of experience placing individuals in jobs. (*Id*. at PageID.121-122.)

### F. Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The newly promulgated regulations, applicable to applications for disability benefits filed on or after the effective date of March 27, 2017, such as Plaintiff's application here, distinguish between acceptable medical sources, medical sources and nonmedical sources. An acceptable medical source means a medical source who is a:

(1)    Licensed physician (medical or osteopathic doctor);

(2)    Licensed Psychologist, which includes:

     (i)    A licensed or certified psychologist at the independent practice level; or

     (ii)    A licensed or certified school psychologist, or other licensed or certified individual with another title who performs the same function as a school psychologist in a school setting, for

> impairments of intellectual disability, learning disabilities, and borderline intellectual functioning only;

(3)     Licensed optometrist for impairments of visual disorders, or measurement of visual acuity and visual fields only, depending on the scope of practice in the State in which the optometrist practices;

(4)     Licensed podiatrist for impairments of the foot, or foot and ankle only, depending on whether the State in which the podiatrist practices permits the practice of podiatry on the foot only, or on the foot and ankle;

(5)     Qualified speech-language pathologist for speech or language impairments only. For this source, qualified means that the speech-language pathologist must be licensed by the State professional licensing agency, or be fully certified by the State education agency in the State in which he or she practices, or hold a Certificate of Clinical Competence in Speech-Language pathology from the American Speech-Language-Hearing Association;

(6)     Licensed audiologist for impairments of hearing loss, auditory processing disorders, and balance disorders within the licensed scope of practice only [];

(7)     Licensed Advanced Practice Registered Nurse, or other licensed advanced practice nurse with another title, for impairments within his or her licensed scope of practice []; or

(8)     Licensed Physician Assistant for impairments within his or her licensed scope of practice [].

20 C.F.R. § 404.1502(a).

A medical source is "an individual who is licensed as a healthcare worker by a State and working within the scope of practice permitted under State or Federal law, or an individual who is certified by a State as a speech-language pathologist or a school psychologist and acting within the scope of practice permitted under State or Federal law." *Id.*, § 404.1502(d).

In contrast, a nonmedical source means "a source of evidence who is not a medical source." *Id.*, § 404.1502(e). "This includes, but is not limited to: (1) You; (2) Educational personnel (for example, school teachers, counselors, early intervention team members, developmental center workers, and daycare center workers); (3) Public and private social welfare agency personnel; and (4) Family members, caregivers, friends, neighbors, employers, and clergy." *Id.*

The SSA "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical findings, including those from your medical sources." *Id.*, § 404.1520c(a). "The most important factors we consider when we evaluate the persuasiveness of medical opinions and prior administrative medical findings are supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section)." *Id.* The SSA will consider several factors when it contemplates "the medical opinion(s) and prior administrative medical findings" in a case. *Id.*

Of these factors, the first is "supportability." This factor considers that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be[.]" *Id.*, § 404.1520c(c)(1).

The SSA will also consider the "consistency" of the claim. This includes the consideration that "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources

in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be[.]" *Id.*, § 404.1520c(c)(2).

In addition, the SSA will consider the "[r]elationship with claimant[.]" *Id.*, § 404.1520c(c)(3). This factor will include the analysis of:

(i)    Length of the treatment relationship. The length of time a medical source has treated you may help demonstrate whether the medical source has a longitudinal understanding of your impairment(s);

(ii)    Frequency of examinations. The frequency of your visits with the medical source may help demonstrate whether the medical source has a longitudinal understanding of your impairment(s);

(iii)    Purpose of the treatment relationship. The purpose for treatment you received from the medical source may help demonstrate the level of knowledge the medical source has of your impairment(s);

(iv)    Extent of the treatment relationship. The kinds and extent of examinations and testing the medical source has performed or ordered from specialists or independent laboratories may help demonstrate the level of knowledge the medical source has of your impairment(s);

(v)    Examining relationship. A medical source may have a better understanding of your impairment(s) if he or she examines you than if the medical source only reviews evidence in your folder[.]

*Id.* The fourth factor of the SSA's analysis is "specialization." In making this determination, the SSA will consider "[t]he medical opinion or prior administrative medical finding of a medical source who has received advanced education and training to become a specialist may be more persuasive about medical issues related to his or her area of specialty than the medical opinion or prior administrative medical finding of a medical source who is not a specialist in the relevant area of specialty." *Id.*, § 404.1520c(c)(4).

Finally, the SSA will consider "other factors." These may include any other factors that "tend to support or contradict a medical opinion or prior administrative medical

finding." *Id.*, § 404.1520c(c)(5). "This includes, but is not limited to, evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements." *Id.* Further, when the SSA considers "a medical source's familiarity with the other evidence in a claim, we will also consider whether new evidence we receive after the medical evidence source made his or her medical opinion or prior administrative medical finding makes the medical opinion or prior administrative medical finding more or less persuasive." *Id.*

As to the duty to articulate how persuasive the medical opinions and prior administrative medical findings are considered, the new regulations provide "articulation requirements." The ALJ will consider "source-level articulation." Pursuant to this requirement, "[b]ecause many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for [the ALJ] to articulate in each determination or decision how [he or she] considered all of the factors for all of the medical opinions and prior administrative medical findings in [each] case record." *Id.*, § 404.1520c(b)(1).

"Instead, when a medical source provides multiple medical opinion(s) or prior administrative finding(s), [the ALJ] will articulate how [he or she] considered the medical opinions or prior administrative findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate." *Id.* The regulation reiterates that the ALJ is "not required to articulate how [he or she] considered each medical opinion or prior administrative finding from one medical source individually." *Id.*

The regulations stress that the "factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions or prior administrative medical findings to be." *Id.*, § 404.1520c(b)(2). As such, the SSA "will explain how we considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision. We may, but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we articulate how we consider medical opinions and prior administrative medical findings in your case record." *Id.*

When medical opinions or prior administrative findings are "equally persuasive," "well-supported" and "consistent with the record" "about the same issue," "but are not exactly the same, [the ALJ] will articulate how [he or she] considered the other most persuasive factors[] for those medical opinions or prior administrative medical findings in [the claimant's] determination or decision." *Id.*, § 404.1520c(b)(3).

The regulations clarify that the SSA is "not required to articulate how we considered evidence from non-medical sources using the requirements of paragraphs (a) through (c) of this section." *Id.*, § 404.1520c(d).

In addition, the regulations expressly state that the SSA will not consider "evidence that is inherently neither valuable nor persuasive" and "will not provide any analysis about how we considered such evidence in our determination or decision, even under § 404.1520c." *Id.*, § 404.1520b(c). The regulations categorize evidence that is inherently

neither valuable nor persuasive as: "[d]ecisions by other governmental and nongovernmental entities;" "[d]isability examiner findings," meaning, "[f]indings made by a State agency disability examiner made at a previous level of adjudication about a medical issue, vocational issue, or the ultimate issue about whether you are disabled;" and "[s]tatements on issues reserved to the Commissioner[;]" these statements include:

 (i) Statements that you are or are not disabled, blind, able to work, or able to perform regular or continuing work;

 (ii) Statements about whether or not your impairment(s) meets or medically equals any listing in the Listing of Impairments[];

 (iii) Statements about what your residual functional capacity is using our programmatic terms about the functional exertional levels [] instead of descriptions about your functional abilities and limitations[];

 (iv) Statements about whether or not your residual functional capacity prevents you from doing past relevant work[];

 (v) Statements that you do or do not meet the requirements of a medical-vocational rule[]; and

 (vi) Statements about whether or not your disability continues or ends when we conduct a continuing disability review[.]

*Id.*, § 404.1520b(c).

The regulations also provide that "[b]ecause a decision by any other governmental and nongovernmental entity about whether you are disabled, blind, employable, or entitled to any benefits is based on its rules, it is not binding on us and is not our decision about whether you are disabled or blind under our rules." *Id.*, § 404.1504. Therefore, the Commissioner "will not provide any analysis in our determination or decision about a decision made by any other governmental or nongovernmental entity about whether you are disabled, blind, employable, or entitled to benefits." *Id.* The Commissioner will,

however, "consider all of the supporting evidence underlying the other governmental or nongovernmental entity's decision that we receive as evidence in your claim[.]" *Id.*

The regulations clarify that "[o]bjective medical evidence means signs, laboratory findings, or both." *Id.*, § 404.1502(f). Signs are defined as "one or more anatomical, physiological, or psychological abnormalities that can be observed, apart from your statements (symptoms)." *Id.* Further, "[s]igns must be shown by medically acceptable clinical diagnostic techniques. Psychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities, e.g., abnormalities of behavior, mood, thought, memory, orientation, development or perception, and must also be shown by observable facts that can be medically described and evaluated." *Id.*, § 404.1502(g). Laboratory findings "means one or more anatomical, physiological, or psychological phenomena that can be shown by the use of medically acceptable laboratory diagnostic techniques[,]" and "diagnostic techniques include chemical tests (such as blood tests), electrophysiological studies (such as electrocardiograms and electroencephalograms), medical imaging (such as x-rays), and psychological tests." *Id.*, § 404.1502(c).

The most recent amendments to the regulations also tweaked the manner in which the SSA evaluates symptoms, including pain. "In considering whether you are disabled, we will consider all your symptoms, including pain, and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence. We will consider all your statements about your symptoms, such as pain, and any description your medical sources or nonmedical sources may provide about how the

symptoms affect your activities of daily living and your ability to work[.]" *Id.*, § 404.1529(a).

But the SSA clarified, "however, statements about your pain or other symptoms will not alone establish that you are disabled. There must be objective medical evidence from an acceptable medical source that shows you have a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and that, when considered with all of the other evidence (including statements about the intensity and persistence about your pain or other symptoms which may reasonably be accepted as consistent with the medical signs and laboratory findings), would lead to a conclusion that you are disabled." *Id.*, § 404.1529(a).

Further, "[i]n evaluating the intensity and persistence of your symptoms, including pain, we will consider all of the available evidence, including your medical history, the medical signs and laboratory findings, and statements about how your symptoms affect you." *Id.*, § 404.1529(a). The SSA clarified that it will "then determine the extent to which your alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence to decide how your symptoms affect your ability to work." *Id.*

Finally, the SSA noted that "[b]ecause symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, we will carefully consider any other information you may submit about your symptoms." This other information may include "[t]he information that your medical sources or nonmedical sources provide about your pain or other symptoms (e.g., what may precipitate or aggravate

your symptoms, what medications, treatments or other methods you use to alleviate them, and how the symptoms may affect your pattern of daily living),” which “is also an important indicator of the intensity and persistence of your symptoms.” *Id.*, § 404.1529(c)(3).

“Because symptoms, such as pain, are subjective and difficult to quantify, any symptom-related functional limitations and restrictions that your medical sources or nonmedical sources report, which can reasonably be accepted as consistent with the objective medical evidence and other evidence, will be taken into account…We will consider all of the evidence presented, including information about your prior work record, your statements about your symptoms, evidence submitted by your medical sources, and observations by our employees and other persons[.]” *Id.* The regulations establish that “[f]actors relevant to your symptoms, such as pain, which we will consider include []:

    (i)      [D]aily activities;

    (ii)    The location, duration, frequency, and intensity of . . . pain;

    (iii)   Precipitating and aggravating factors;

    (iv)   The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;

    (v)    Treatment, other than medication, . . . received for relief of . . . pain;

    (vi)   Any measures . . . used to relieve . . . pain.

*Id.*

The new regulations also impose a duty on the claimant: “In order to get benefits, you must follow treatment prescribed by your medical source(s) if this treatment is expected to restore your ability to work.” *Id.*, § 404.1530(a). Stated differently, “[i]f you

do not follow the prescribed treatment without a good reason, we will not find you disabled or, if you are already receiving benefits, we will stop paying you benefits." *Id.*, § 404.1530(b). Acceptable (or "good") reasons for failure to follow prescribed treatment include:

    (1)    The specific medical treatment is contrary to the established teaching and tenets of your religion;

    (2)    The prescribed treatment would be cataract surgery for one eye, when there is an impairment of the other eye resulting in a severe loss of vision and is not subject to improvement through treatment;

    (3)    Surgery was previously performed with unsuccessful results and the same surgery is again being recommended for the same impairment;

    (4)    The treatment because of its magnitude (e.g. open heart surgery), unusual nature (e.g., organ transplant), or other reason is very risky for you; or

    (5)    The treatment involves amputation of an extremity, or major part of an extremity.

*Id.*, § 404.1530(c).

### G. Arguments and Analysis

#### i.   ALJ's failure to assess physical limitations

Plaintiff argues that the ALJ failed to properly assess his physical condition and limitations. (ECF No. 14, PageID.1515.) Specifically, Plaintiff opines that the ALJ failed "to find Plaintiff's lower extremity edema to be a 'severe' [medically determinable impairment (MDI)] [and] she failed to consider the edema as an independent MDI itself." (*Id.* at PageID.1521.)

The ALJ found in the medical record, regarding Plaintiff's edema, "[i]n contrast with the claimant's statements in November 2018, at other appointments during the period

20

at issue in this claim, the claimant never mentioned a need to elevate his legs or to use the bathroom more frequently than normal. Moreover, there is no evidence that any doctor or other treating provider ever advised the claimant to elevate his legs during the period at issue in this claim." (ECF No. 12-2, PageID.75.)

Confusingly, Plaintiff seems to take issue with the ALJ's assertion that there was no medical record evidence Plaintiff needed to elevate his legs—and in response, Plaintiff writes, "not a single doctor anywhere in the record, opined Claimant would not have to elevate his legs to the extent that he testified . . . [t]he non-examining, non-treating doctors, from whom the ALJ seemingly derived her RFC, never explicitly discuss the subject of Plaintiff's need to elevate his legs for relief." (*Id*. at PageID.1522.) Plaintiff seems to argue that the lack of evidence *not* requiring Plaintiff to raise his legs suggests that he *should* be required to raise his legs.

This argument is baseless. The ALJ found no evidence requiring Plaintiff to raise his legs, and thus, properly decided that Plaintiff's testimony was not supported and that Plaintiff's need to raise his legs was not a medically determinable impairment. To this end, Defendant argues, "Plaintiff's assertions, however, presuppose that the Commissioner bears the burden to demonstrate RFC. To the contrary, Plaintiff bears the burden at this stage of the sequential evaluation. *See Her v. Comm'r of Soc. Sec*., 203 F.3d 388, 391 (6th Cir. 1999) ("[T]he burden of proof lies with the claimant at steps one through four of the process, culminating with a claimant's proof that she cannot perform her past relevant work."). Plaintiff's attempt to shift the burden should be rejected." (ECF No. 17, PageID.1550.) I agree. Plaintiff presents no evidence of the medical record requiring

Plaintiff to elevate his legs. Defendant also points out "State agency medical consultant Dr. Amigo considered Plaintiff's lower extremity edema, as well as his function report (wherein Plaintiff alleged that he needed to elevate his legs), and did not impose any limitations requiring that Plaintiff elevate his legs (ECF No. 12-3, PageID.145, 150-152; see ECF No. 12-6, PageID.327-334)." (*Id.*) I suggest that Plaintiff's argument on this point fails.

To the extent that Plaintiff argues his lower extremity edema was not properly considered in the RFC, Defendant makes arguments that I find persuasive. First, "[w]hile Plaintiff was diagnosed with lower extremity edema, it has been attributed to his cardiac condition, in that his edema was deemed 'secondary to venous stasis/mild congestive heart failure.'" (ECF No. 17, PageID.1539 (citation omitted.)) Indeed, a medical record from James Larkin, D.O., dated April 1, 2017, notes in the "final diagnosis" section, "[l]ower extremity edema secondary to venous stasis/mild congestive heart failure." (ECF No. 12-14, PageID.1264.) And while the ALJ did not include Plaintiff's lower extremity edema as a separate and distinct medical impairment, she did include Plaintiff's history of heart problems as a severe impairment. The ALJ described Plaintiff's medical history and noted that Plaintiff "required extensive hospitalization and rehabilitation in 2016," "the claimant received an aortic valve replacement on July 7, 2016," and that at "a follow-up in May 2017, the claimant's left leg appeared bigger than the right, but with no sign of pitting edema or tenderness on the left leg . . . [t]he claimant was diagnose with chronic deep vein thrombosis of the proximal vein of the left lower extremity." (ECF No. 12-2, PageID.75.) The ALJ included an analysis of Plaintiff's edema as occurring after, and due to, his

underlying heart problems; and because the edema is described as "secondary" to the history of heart failure in the record, which was included in the ALJ's analysis, I suggest that the ALJ did not err by including the edema based solely on its diagnosis. *See Higs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) (citation omitted) ("mere diagnosis of arthritis . . . says nothing about the severity of the condition").

Finally, to be sure, the ALJ did in fact refer to Plaintiff's complaints of swelling, but noted "records show stable, controlled edema with largely normal physical examination findings . . . [l]ower extremity edema was seen at examinations in September 2017, December 2017, and November 2018, but physical examinations on other occasions during this period showed no sign of edema, and the claimant's edema was described as 'stable.'" (ECF No. 12-2, PageID.75.) Ultimately, the ALJ concluded "[t]he claimant's degenerative disc disease and peripheral neuropathy can be expected to contribute to his physical limitations, but the results of physical examinations during the period at issue in this claim do not support limitations greater than those described in the residual functional capacity assessment." (*Id.*) The ALJ acknowledged Plaintiff's complaints but ultimately determined that they were not supported by the record, and thus, I suggest the ALJ did not err.

### ii.  Lack of substantial evidence

Next, Plaintiff argues that the ALJ's decision was not supported by substantial evidence. (ECF No. 14, PageID.1515.) Plaintiff asserts the ALJ's conclusion that Plaintiff could perform light work and, specifically, work as an inspector, are not supported by substantial evidence. (*Id.* at PageID.1518.) Plaintiff does not cite any record medical evidence in support of this position. Plaintiff only writes, "[w]hen discussing Claimant's

leg edema in the ALJ Decision, even though not considered an MDI, the ALJ mischaracterized the definition of the word "stable" in Plaintiff's medical records. (Tr. 25) Stable does not mean nonexistent or non-severe; it means Plaintiff's battle with leg edema never subsided." (ECF No. 14, PageID.1523.) Although Plaintiff argues that his leg edema "never subsided," he does not cite any record medical evidence to support this argument. Plaintiff provides only the following: "[t]he number of physicians who have observed and/or treated Claimant's bilateral leg edema are many (Tr. 310-311), and the citations contained in Tr. 310-311 are hereby incorporated by reference." (ECF No. 14, PageID.1520). Defendant has helpfully provided that the "Tr." pages to which Plaintiff refers appear to coincide with ECF No. 12-6, PageID.364-365. (ECF No. 17, PageID.1540.) This document is not a record medical source, but a copy of Plaintiff's pre-hearing memorandum, the evidence and argument of which he apparently attempts to "incorporate by reference" here.

I pause here to note that "it is not the role of the court to 'conduct a de novo review in social security proceedings,' nor to 'search the administrative record for evidence to support [P]laintiff's argument' or find law supporting her claim.'" *Lampkin v. Comm'r of Soc. Sec.*, No. 3:15-cv-511, 2016 WL 4248777, *9 (N.D. Ohio, August 11, 2016) (citing *Jones v. Comm'r of Soc. Sec.*, No. 3:12-CV-2986, 2013 WL 4748083, *8 (N.D. Ohio Sept. 4, 2013). Further, "[g]enerally, arguments not properly raised and accompanied by 'some effort at developed argumentation[ ] are deemed waived.'" (*Id*. citing *Jones*, 2013 WL 4748083, at *8.) Whether or not this claim lacks an "effort at developed argumentation" and should be deemed waived, I nonetheless emphasize that it is not the role of this Court

to search the medical record on Plaintiff's behalf for evidence in his favor when he has failed to do so himself. *See also Deguise v. Comm'r of Soc. Sec.*, No. 12-10590, 2013 WL 1189967, at *7 (E.D. Mich. Feb. 19, 2013) ("[P]laintiff cannot simply make the claim that the ALJ erred . . . while leaving it to the Court to scour the record to support this claim.") *report and recommendation adopted*, 2013 WL 1187291 (E.D. Mich. Mar. 22, 2013). Plaintiff has failed to refer this Court to evidence in the record that supports his argument that the ALJ's decision is not supported by substantial evidence. I suggest that his argument fails on this ground alone.

### iii.  Questioning of the VE

Finally, Plaintiff argues that "[d]uring Plaintiff's hearing, the ALJ asked hypothetical questions concerning the effects of Plaintiff's need to elevate his legs throughout the day. Because the record cannot support an assessment of zero limitations attributable to Plaintiff resulting from lower extremity edema, the hypothetical question, and the VE answer thereto, ultimately relied upon by the ALJ was defective." (Id. at PageID.1522.

To this end, and in support of their position, Defendant points out that "Plaintiff's argument is unavailing because the hypothetical question corresponds with the RFC. *See* ECF No. 12-2, PageID.73, 116-117. As explained in Part VI.B., *supra*, substantial evidence supports the RFC, so Plaintiff's derivative attack on the hypothetical question must likewise fail." (ECF No. 17, PageID.1554.) Defendant quotes *McClellan v. Comm'r of Soc. Sec.*, No. 13-12435, 2014 WL 4473869, at *8 (E.D. Mich. Aug. 14, 2014), *report and recommendation adopted*, 2014 WL 4475691 (E.D. Mich. Sept. 9, 2014) in further support:

"Because the ALJ's hypothetical question to the vocational expert accurately described plaintiff's RFC as determined by the ALJ . . . the ALJ was entitled to rely on the vocational expert's testimony." (*Id*. citing *McClellan*, 2014 WL 4473869, at *8) (also citing *Webb v. Comm'r of Soc. Sec*., 368 F.3d 629, 633 (6th Cir. 2004) (holding that the ALJ was responsible for determining plaintiff's RFC, then framing hypothetical questions to the vocational expert incorporating only the RFC) (internal citations omitted)). (ECF No. 17, PageID.1554.)

The transcript reveals that the ALJ properly asked questions of the VE regarding Plaintiff's edema: the ALJ asked whether the inspector position or any of the listed positions offered flexibility to work from a seated or standing position. (ECF No. 12-2, PageID.119.) The VE responded that approximately 80% of the jobs would offer that option. (*Id*. at PageID.120.) The ALJ then asked about an individual who needed to have opportunities for breaks to elevate his legs for about four hours a day, and assumed an individual who needed these breaks at least 15 minutes an hour. (*Id*.) The VE responded that "someone who is off task 15 minutes out of every hour is not going to be able to work competitively." (*Id*.) The ALJ asked whether, "in order to elevate his legs," the individual was absent at least twice a month on a recurring basis would affect his ability to remain employed. (*Id*.) The VE responded that "someone who is missing work at least twice a month is not going to be able to hold competitive employment in my experience." (*Id*. at PageID.121.) The VE testified that there would not be an opportunity at a worksite to elevate one's legs in competitive employment. (*Id*.)

The ALJ's questions to the VE about Plaintiff's elevating his legs were not vague; they specified how frequently Plaintiff could raise them and remain in competitive employment. Further, as Defendant points out, because these questions and their responses comported with the ALJ's ultimate RFC determination, and the ALJ's review of the medical record, the ALJ did not err in asking these questions or relying on the VE's responses. *See McClellan*, 2014 WL 4473869, at *8.

### H. Conclusion

For these reasons, I suggest that substantial evidence supports the Commissioner's denial of benefits, and I recommend **DENYING** Plaintiff's motion, (ECF No. 14), **GRANTING** Defendant's motion, (ECF No. 17), and affirming the decision.

### III.   REVIEW

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370,

1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date: May 17, 2021                                  S/ PATRICIA T. MORRIS
                                                    Patricia T. Morris
                                                    United States Magistrate Judge